

Deposition of:
# Craig Mack

*August 12, 2020*

In the Matter of:

# Vasquez, Jose T. v. District of Columbia, et al

Veritext Legal Solutions
800-734-5292 | calendar-dmv@veritext.com |

Page 1

```
 1           IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLUMBIA
 2
 3     _____
                                  :
 4     JOSE T. VASQUEZ,           :
                                  :
 5            Plaintiff,          :
                                  :
 6     v.                         :  Case No.
                                  :  1:17-cv-02194-APM
 7     DISTRICT OF COLUMBIA,      :
       et al.,                    :
 8                                :
              Defendants.         :
 9     _____:
10
11               Wednesday, August 12, 2020
12
                30(b)(6) Deposition of CRAIG D. MACK,
13
       taken virtually via Zoom, with the witness
14
       participating from the DC Metro Police
15
       Department Offices, located at 300 Indiana
16
       Avenue, NW, Washington, DC, beginning at 10:43
17
       a.m., before Ryan K. Black, a Registered
18
       Professional Reporter, Certified Livenote
19
       Reporter and Notary Public in and for
20
       the Commonwealth of Pennsylvania.
21
22
23
24
25
```

Page 27

1    Q.    Mm-hmm.
2          All right.  So would there have been
3    any way for Officer Cole to even know that
4    Officer Agosto was making the inquiry of Will
5    County Sheriff's Office?
6    A.    No.  It's my understanding that Rubin
7    must have picked up the phone when somebody from
8    that jurisdiction called, and he handled that
9    phone call.  That's where it led to him speaking
10   to that person from that sheriff's office.
11   Q.    Okay.  Do you know why it was Officer
12   Agosto and not Officer Cole, who, in turn, on
13   November 3rd, forwarded the teletype message to
14   Shavaka Melvin in the U.S. Attorney's Office?
15   A.    Because I believe he's the one that
16   had that in his hand when he went up and cleared
17   out the box that we have upstairs.  So because
18   it was an important message, he sent that out.
19   Similar to any fax that comes on my machine,
20   anybody that picks up a fax that says something
21   to the extent of the state's attorney has
22   changed their extradition authorization, that
23   person is responsible for making notification to
24   the U.S. Attorney's Office.
25   Q.    With respect to -- well, let me back

Page 28

1  up a little bit.
2          How frequent is it that out-of-state
3  jurisdictions will send a teletype message
4  saying either our extradition request has
5  changed or you have the wrong person in custody?
6      A.   Well, having the wrong person in
7  custody is not very often.  I only recall, I
8  believe, one other case where it was -- I only
9  remember one other case -- we get many faxes
10 from jurisdictions such as Anne Arundel County
11 and Maryland State Police stating that their
12 state's attorney has changed their extradition
13 authorization.  That's the most, for lack of a
14 better term, popular channel of action for
15 those.
16     Q.   Okay.  And when was the other instance
17 of a message being received that the person
18 being detained was not the correct -- or not the
19 person wanted in the warrant?
20     A.   So that wasn't a message received.  It
21 was a phone call from Prince George's County,
22 and it was two females who had been using each
23 other's names for quite some time.
24          The one that we had in custody, I
25 would have to pull that jacket to determine

Page 29

```
 1  whether we had the one in custody that was
 2  actually the one that was wanted or whether it
 3  was the other one.  I don't recall exactly how
 4  it was, but the two of them were intertwined.
 5       Q.   Do you know how long ago that was?
 6       A.   Two, three years ago.
 7       Q.   Okay.  And how frequently do you
 8  receive messages, whether they're faxes from PG
 9  County or Anne Arundel County or Prince George's
10  County or teletype messages from anywhere else
11  indicating that their extradition request is
12  being changed?
13       A.   Several times a week, especially since
14  the COVID-19 pandemic has hit.
15       Q.   Prior to COVID, beginning in March of
16  this year, how frequently did you receive those
17  messages?
18       A.   Probably once a week.
19       Q.   And do those messages receive any kind
20  of special attention?
21       A.   Yes.
22       Q.   Do they receive special attention at
23  the Teletype Unit?
24       A.   I can't speak on behalf of teletype.
25       Q.   All right.  Do they receive any kind
```

Page 30

1  of special attention by the Fugitive Unit?
2       A.   Yes.  Any fax that we get on our
3  machine that says that the state's attorney has
4  changed their extradition authorization, it's
5  the responsibility of the officer that received
6  that fax to send it to the U.S. Attorney's
7  office with an explanation, make a notation on
8  the Extradition Unit folder and also place that
9  inside the folders, as well as the receipt of
10 the e-mail sent to the U.S. Attorney's office.
11      Q.   Is there a written procedure that
12 specifies that?
13      A.   I'd have to look back, but it's just
14 been the standing procedure since I've been
15 there.
16      Q.   Okay.  And the reason for that
17 standing procedure is, if you're holding the
18 wrong person, you want to release them as soon
19 as possible, right?
20      A.   Correct.  It's in the best interest of
21 the police department and the U.S. Attorney's
22 Office to clear up any cases where people may no
23 longer be wanted by the State's Attorney.
24      Q.   Well, it's not just in the interest of
25 the U.S. Attorney's office and the Metropolitan