## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **JOSE T. VASQUEZ,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No. 17-cv-02194 (APM)** |
| ) | |
| **COUNTY OF WILL, ILLINOIS, et al.,** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

## MEMORANDUM OPINION AND ORDER

### I.      INTRODUCTION

Plaintiff Jose T. Vasquez shares a name and date of birth with, unfortunately for Plaintiff, another person against whom there is an active warrant for a decades-old homicide.  Plaintiff has been mistakenly arrested and detained numerous times as a result, including twice in the District of Columbia.  He seeks compensatory and punitive damages for these wrongful arrests.

At the center of the present action is the D.C. Metropolitan Police Department's ("MPD") use of teletype messages to confirm that warrants issued by other jurisdictions match the person arrested in the District of Columbia.  Plaintiff claims that, because MPD mishandled a teletype message confirming that he was not the person wanted for the homicide, he was improperly detained for days until he was released by a magistrate judge.  He also contends that he was arrested and detained a second time due to MPD's failure to chronicle the first improper arrest.  Plaintiff brings a seven-count Complaint, alleging multiple section 1983 claims based on violations of the Fourth and Fifth Amendments, as well as common law claims grounded in intentional tort and negligence.

Defendants in this case are the District of Columbia and MPD Officer Ruben Agosto. They have moved for summary judgment on all claims.

For the reasons that follow, the court grants in part and denies in part Defendants' Motion for Summary Judgment.

## II.   BACKGROUND

### A.   Factual Background

Plaintiff Jose T. Vasquez is a resident of the State of Maryland. Pl.'s Unopposed Mot. for Leave to File Under Seal, ECF No. 73, Third Am. Compl., ECF No. 73-2 [hereinafter Third Am. Compl.], ¶ 1. He has been arrested multiple times on a warrant issued for a person accused of homicide who shares the same name and date of birth. The warrant was issued by law enforcement authorities in Will County, Illinois. Defs.' Mot. for Summ. J., ECF No. 85 [hereinafter Defs.' Mot.], Defs.' Stmt. of Undisputed Material Facts, ECF No. 85-2 [hereinafter Defs.' SOF], ¶ 3. Illinois authorities made a grave error leading to Plaintiff's improper arrests—it entered the warrant with Plaintiff's Social Security Number rather than the murder suspect's Social Security Number. Defs.' SOF ¶ 5; Defs.' Mot., Dep. of Officer Terence Sutton, Ex. 3, ECF No. 85-6, at 17; *see also* Third Am. Compl. ¶ 3. As a result, Plaintiff matched the warrant database at first glance, leaving him susceptible to a false arrest. Such an arrest occurred at least four times (i.e., 2005, "one or more other occasions prior to 2009," 2016, and 2017) over a period of twelve years. Third Am. Compl. ¶¶ 30–31 , 36, 61.

In 2013, the Will County Sheriff's Office, after repeated false notifications, updated their warrant entry to prevent future arrests of Plaintiff. The updated entry informed law enforcement agencies: "DO NOT DETAIN A VASQUEZ, JOSE [redacted birthdate] SS [redacted] THIS IS NOT SUSPECT." Pl.'s Consent Mot. for Leave to File Under Seal, ECF No. 87 [hereinafter Pl.'s

Mot. for Leave], Pl.s Opp'n to Defs.' Mot. for Summ. J., ECF No. 87-2 [hereinafter Pl.'s Opp'n], ¶ 3; *see also* Third Am. Compl. ¶ 35 (noting the timing of the change).  Regrettably, this update did not inoculate Plaintiff from future mistaken arrests.

        *1.*    *First Arrest*

This action concerns two such arrests occurring in 2016 and 2017 in the District of Columbia.  The first took place on October 23, 2016.  On that date, Officer Terence Sutton of the MPD arrested Plaintiff after a traffic stop on the 5400 block of Georgia Avenue N.W.  Defs.' SOF ¶ 1; Pl.'s Mot. for Leave, Pl.'s Stmt. of Genuine Issues of Disputed Material Fact & Add'l Issues of Material Fact, ECF No. 87-3 [hereinafter Pl.'s SOF], ¶ 1.  Officer Sutton ran a query in the National Crime Information Center ("NCIC") database, which returned two contradictory entries.  Pl.'s SOF ¶ 4; Pl.'s Opp'n, Ex. B., ECN No. 87-8 at 1; *see also* Third Am. Compl ¶ 26.  One entry for a failure to appear on a homicide charge matched Plaintiff's name, date of birth, and Social Security Number.  Pl.'s SOF ¶ 3.  The other for the underlying homicide charge contained the notation "DO NOT DETAIN A VASQUEZ, JOSE [redacted birthdate] SS [redacted]. THIS IS NOT SUSPECT."  *Id.*  Officer Sutton did not notice this second entry and arrested Plaintiff on the warrant.  Pl.'s SOF ¶ 3; Pl.'s Opp'n, Dep. of Officer Terence Sutton, ECF No. 87-7, at 19–20.

The next day, a different MPD officer, Officer Ernest Cole, sent a teletype message notifying the Will County Sheriff's Office of Plaintiff's apprehension and seeking confirmation that it would extradite him.  Defs.' SOF ¶ 9; Pl.'s SOF ¶ 9.  He did not, however, send Plaintiff's Social Security Number with this "hit and locate" inquiry.  Pl.'s SOF ¶ 9.  Meanwhile, Officer Cole also initiated a fugitive criminal action against Plaintiff, despite his protests that he was a victim of mistaken identity and had never stepped foot in Illinois.  Defs.' SOF ¶¶ 10–11; Pl.'s SOF

¶¶ 10–11, 39.   After his arraignment, a D.C. Superior Court judge ordered Plaintiff detained without bond pending an extradition hearing.  Defs.' SOF ¶ 11; Pl.'s SOF ¶ 11.

On October 28, 2016, MPD Officer Ruben Agosto, a Defendant in the present action, emailed the Will County Sheriff's Office a photograph of Plaintiff and his fingerprints.  Defs.' SOF ¶ 12; Pl.'s SOF ¶ 12.  Later that day, Will County alerted the MPD Fugitive Unit by teletype that any holds on Plaintiff should be released.  Defs.' SOF ¶ 16; Pl.'s SOF ¶ 16.  Plaintiff, however, would not be released for another five days.  Defs.' SOF ¶¶ 22–23; Pl.'s SOF ¶¶ 22–23.  On November 2, 2016, at a bond review hearing, Plaintiff's defense counsel raised the issue of mistaken identity, and the court ordered the U.S. Attorney's Office to look into the matter.  Defs.' SOF ¶ 20; Pl.'s SOF ¶ 20.  The next day, November 3, 2021, Officer Agosto sent the now days-old, exonerating teletype message received from Will County to the U.S. Attorney's Office, which then moved to dismiss the fugitive case against Plaintiff, leading to his release that same day.  Defs.' SOF ¶¶ 22–23; Pl.'s SOF ¶¶ 22–23.

### 2.   Second Arrest

On March 3, 2017, Plaintiff was arrested in the District of Columbia once again following a traffic stop, this time by a U. S. Secret Service Officer.  Defs.' SOF ¶¶ 24, 27; Pl.'s SOF ¶¶ 24, 27.  Plaintiff was taken into custody after discovery of the open warrant from Will County.  Defs.' SOF ¶ 26; Pl.'s SOF ¶ 26.  Plaintiff eventually was taken to MPD for processing; he claimed his innocence throughout, both to the arresting officer and to MPD.  Pl.'s SOF ¶ 67; Defs.' Reply in Further Supp. of Defs.' Mot., ECF No. 93 [hereinafter Defs.' Reply], Defs.' Resp. to Pl.'s Stmt. of Genuine Issues of Disputed Material Fact & Add'l Issues of Material Fact, ECF No. 93-1 [hereinafter Defs.' Reply SOF], ¶ 67.  MPD again initiated a fugitive case against Plaintiff.  Defs.' SOF ¶ 30; Pl.'s SOF ¶ 30.  Only after his arraignment on March 4, 2017, when his defense attorney

alerted the presiding judge that he had been arrested based on this mistaken identity just months earlier, was Plaintiff released.  Defs.' SOF ¶ 31; Pl.'s SOF ¶ 31.

### B.     Procedural Background

This matter has taken many twists and turns since its filing.  Plaintiff brought this action on October 23, 2017.  Compl., ECF No. 1.  The Complaint, as originally filed, contained twelve counts against various defendants, including individual MPD officers, the arresting Secret Service officer, the District of Columbia, a John Doe defendant from Illinois, and two Illinois state governments: the County of Will and the City of Joliet.  *Id.* ¶¶ 2–7.  On April 23, 2018, Plaintiff filed a First Amended Complaint that dropped claims against the individual MPD officers and the arresting Secret Service officer.  First Am. Compl., ECF No. 28.  Then, on April 30, 2018, Plaintiff moved to split his claims into two actions and transfer the claims against the Illinois-based defendants to the Northern District of Illinois.  Pl.'s Unopposed Mot. to Sever Claims & Transfer Claims to N.D. Ill., ECF No. 29.  The court granted that motion, Order, ECF No. 30, leaving only Plaintiff's claims against the District of Columbia in the then-operative complaint.

Thereafter, the District moved to dismiss the action for failure to state a claim on May 7, 2018.  Def.'s Mot. to Dismiss, ECF No. 32.  The court granted this Motion on November 14, 2018, but gave Plaintiff leave to file an amended complaint.  Mem. Op. & Order, ECF No. 39.  Plaintiff filed a Second Amended Complaint on November 28, 2018, against the District of Columbia and a John Doe MPD officer.  Pl.'s Unopposed Mot. for Leave to File Under Seal, ECF No. 41, Second Am. Compl., ECF No. 41-2.  Defendant District of Columbia again moved to dismiss.  Def.'s Mot. to Dismiss Pl.'s Second Am. Compl., ECF No. 47.  The court granted the motion in part and denied the motion in part.  Mem. Op. & Order, ECF No. 52.  The court permitted Plaintiff to proceed on his common law claims of false imprisonment and malicious prosecution against the District of

Columbia and a section 1983 claim against the John Doe defendant. *See id.* at 7, 10, 11. The court dismissed Plaintiff's claims against the District of Columbia for negligence and under section 1983 for failure to state a claim. *See id.* at 13, 15. After the District of Columbia filed an Answer, the matter proceeded to discovery. Discovery closed on September 1, 2020. Order, ECF No. 64.

Plaintiff then filed a Third Amended Complaint on September 25, 2020, which is now the operative pleading. Third Am. Compl.; Minute Order, Nov. 3, 2020 (accepting the Third Amended Complaint for filing). This amended pleading identified Defendant Officer Ruben Agosto as the John Doe defendant and added or amended various claims. *See* Pl.'s Consent Mot. for Leave to File Redline Copy of Third Am. Compl. Under Seal, ECF No. 74, Redline of Third Am. Compl., ECF No. 74-2. Counts I, II, and III allege false arrest/imprisonment, malicious prosecution, and negligence against the District of Columbia. Third Am. Compl. ¶¶ 74–88. Count IV asserts a section 1983 claim against Officer Agosto based on a violation of Plaintiff's rights under the Fourth Amendment. *Id.* ¶¶ 89–99. Counts V through VII allege section 1983 claims against the District of Columbia based on different theories of *Monell* liability. *Id.* ¶¶ 100–118.

Defendants now move for summary judgment on all claims. Defs' Mot.

## III.   LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "genuine dispute" of a "material fact" exists when the fact is "capable of affecting the substantive outcome of the litigation" and "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Elzeneiny v. District of Columbia*, 125 F. Supp. 3d 18, 28 (D.D.C. 2015).

In assessing a motion for summary judgment, the court looks at the facts in the light most favorable to the nonmoving party and draws all justifiable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  To defeat a motion for summary judgment, the nonmoving party must put forward "more than mere unsupported allegations or denials"; its opposition must be "supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial" and that a reasonable jury could find in its favor.  *Elzeneiny*, 125 F. Supp. 3d at 28 (citing Fed. R. Civ. P. 56(e)); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

## IV.   DISCUSSION

The court addresses the counts in the order in which they appear in the Third Amended Complaint.  So, the court begins with the common law claims against the District of Columbia (Counts I through III), and then turns to the section 1983 claims against Officer Agosto (Count IV) and the District of Columbia (Counts V through VII).

### A.   Count I:  False Imprisonment

Although he labels his claim as one for "False Arrest/Imprisonment," Third. Am. Compl. at 18, Plaintiff's claim is better understood as one for only false imprisonment.  Although the two torts are often thought of as "indistinguishable as a practical matter," *Enders v. District of Columbia*, 4 A.3d 457, 461 (D.C. 2010), "[f]alse arrest is a term that describes the setting for false imprisonment when it is committed by an officer or by one who claims the power to make an arrest." *Jones v. District of Columbia*, No. 16-CV-2405 (DLF), 2019 WL 5690341, at *5 (D.D.C. June 13, 2019) (internal quotation marks omitted).  Thus, a claim for false arrest is limited to circumstances constituting an arrest, but a claim for false imprisonment applies more broadly to improper detention.  *See id.*  Here, Plaintiff's claim against the District of Columbia in Count I

7

arises from his erroneous detention in March 2017.  Third Am. Compl. ¶ 75.  MPD did not arrest Plaintiff then; the Secret Service did.  *Id.* ¶ 61.  MPD therefore did not "claim[] the power to make an arrest" of Plaintiff in March 2017.  MPD's continued detention of him after the arrest by another entity is therefore best understood as a claim of false imprisonment.

False imprisonment is an intentional tort, and a plaintiff must prove that the defendants committed "an act intended to impose confinement or known by the actor to be substantially certain of doing so." *Johnson v. United States*, 547 F.2d 688, 692 (D.C. Cir. 1976).  The "gist" of such a claim "is an unlawful detention." *Dent v. May Dep't Stores Co.*, 459 A.2d 1042, 1044 (D.C. 1982).  A plaintiff must produce evidence showing "a restraint against [his] will, as where [he] yields to force, to the threat of force or to the assertion of authority." *Faniel v. Chesapeake & Potomac Tel. Co. of Md.*, 404 A.2d 147, 152 (D.C. 1979).

The District of Columbia does not contend that Plaintiff was lawfully detained.  *See* Defs.' Mot. at 17–19.  Rather, it advances two defenses to Plaintiff's claim—neither of which is convincing.

First, the District contends that Plaintiff had already been arrested by the Secret Service when he came into MPD's custody on or about March 4, 2017, and, because "there was [n]ever a break in his detention," the District cannot be liable for an unlawful detention.  *Id.* at 18.  That argument misconstrues the tort of false imprisonment.  "One way to commit false imprisonment is through a 'refusal to release.'" *Jones*, 2019 WL 5690341, at *5 (alterations omitted) (quoting Restatement (Second) of Torts § 45 (Am. L. Inst. 1975)).  "'If the actor is under a duty to release the other from confinement . . . his refusal to do so with the intention of confining the other is a sufficient act of confinement to make him subject to liability' for false imprisonment." *Id.* (quoting Restatement (Second) of Torts § 45 (Am. L. Inst. 1975)).  And, "where false imprisonment arises

from over-detention, courts do not . . . require a new seizure or arrest." *Id.* at *6. Here, a trier of fact could conclude that the MPD refused to release Plaintiff even though it possessed or had access to information that Plaintiff was not the "Jose T. Vasquez" wanted by Will County. Pl.'s SOF ¶¶ 47–48, 68–71; Defs.' Reply SOF ¶¶ 47–48, 68–71. It therefore does not matter that there was "[n]ever a break in his detention." Defs.' Mot. at 18.

Second, the District argues that the record does not establish that "officers intended to impose unlawful confinement upon the Plaintiff." *Id.* at 19. But once again the District misconstrues the tort of false imprisonment. "Although false imprisonment is classified as an intentional tort, the case law clearly states that 'neither malice nor wrongful intent are controlling considerations in an action for false arrest or false imprisonment.'" *Smith v. District of Columbia*, 306 F. Supp. 3d 223, 261 (D.D.C. 2018) (quoting *Clarke v. District of Columbia*, 311 A.2d 508, 511 (D.C. 1973))." "In other words, there is no requirement that any person must have carried out a deliberate plan to unlawfully detain someone." *Id.* Accordingly, even if MPD officers unlawfully detained Plaintiff by mistake, they can be liable for the tort of false imprisonment, and the officers' innocent intent is not a viable defense. The District is therefore not entitled to summary judgment, and the court denies Defendants' Motion as to Count I.

**B.     Count II:  Common Law Malicious Prosecution**

Count II alleges a claim of malicious prosecution "for [the] March 2017 [a]rrest." Third Am. Compl. at 19. A malicious prosecution claim under District of Columbia law requires:

> (a) a criminal proceeding instituted or continued by the defendant against the plaintiff, (b) termination of the proceeding in favor of the accused, (c) absence of probable cause for the proceeding, and (d) "Malice," or a primary purpose in instituting the proceeding other than that of bringing the offender to justice.

*DeWitt v. District of Columbia*, 43 A.3d 291, 296 (D.C. 2012) (internal quotation marks omitted) (citing *Jarett v. Walker*, 201 A.2d 523, 526 (D.C. 1964)); *see also Tyler v. Cent. Charge Serv., Inc.*, 444 A.2d 965, 968 (D.C. 1982) (stating that a plaintiff must prove that "(1) the underlying suit terminated in the plaintiff's favor; (2) malice on the part of the defendant; (3) lack of probable cause for the underlying suit; and (4) special injury occasioned by the plaintiff as the result of the original action"). The plaintiff has a "heavy burden of proof to show lack of probable cause" in a malicious prosecution action. *DeWitt*, 43 A.3d at 296 (internal quotation marks omitted) (citing *Schleuter v. S. Energy Homes, Inc.*, 252 F. App'x 7, 9 (6th Cir. 2007)).

The District advances two arguments for summary judgment, but neither is persuasive. First, the District maintains that "Plaintiff does not allege intentional conduct by any MPD officer . . . amounting to malice" and his "claim should be construed as a negligence claim and dismissed." Defs.' Mot. at 20. But it is settled that "malice" for the purpose of a malicious prosecution claim does not require "the existence of an evil, wrongful, or improper motive," *Tyler*, 444 A.2d at 969 n.10, but instead can rest on proof of "a willful, wanton, reckless, or oppressive disregard for the rights of the plaintiff," *id.* at 969; *see also Pitt v. District of Columbia*, 491 F.3d 494, 504 (D.C. Cir. 2007) ("The determination of malice is exclusively for the factfinder." (internal quotation marks omitted)). Plaintiff has presented sufficient facts for a factfinder to infer that MPD willfully, wantonly, recklessly, or oppressively disregarded Plaintiff's rights.

It is undisputed that, although Plaintiff came into MPD's custody at 5:00 p.m. on March 3, 2017, Officer Rollins did not run a warrant check in the NCIC database until 11:40 a.m. on the next day. Defs.' Reply SOF, ¶ 68. When he did so, he ran only Plaintiff's name and date of birth. *See id.* ¶ 69. Had he run Plaintiff's Social Security Number in the NCIC database, it would have revealed that the warrant was for a different person. *See id.* Officer Rollins also did not fully

review case information about Plaintiff in the Justice Information System ("JUSTIS"), an online database of Superior Court cases that tracks fugitive warrant cases.  *See id.* ¶¶ 66, 70.  Officer Rollins reviewed case information only about the March 2017 arrest; had he reviewed information about Plaintiff's November 2016 wrongful arrest, he would have learned that the Will County warrant did not apply to Plaintiff.  *See id.* ¶ 71.  Although the District defends Officer Rollins's actions in not running Plaintiff's Social Security Number or reviewing Plaintiff's earlier fugitive arrest in JUSTIS, *see* Defs.' Reply at 22, based on Officer Rollins's failures to investigate, a reasonable trier of fact could find that the District acted with willful, wanton, reckless, or oppressive disregard of Plaintiff's rights.  *See id.* ("A reasonable trier of fact could find that Central Charge acted with such disregard by causing a second writ of attachment to issue without first checking the Court Registry, which it knew might be holding the money it sought.").

Second, the District argues that it cannot be held liable for malicious prosecution because the Secret Service (and not MPD) arrested Plaintiff.  Defs.' Mot. at 20.  But that argument overlooks the undisputed fact that "Officer Rollins prepared an Affidavit in Support of an Arrest Warrant to present to the United States Attorney's Office," which led to Plaintiff being charged as a fugitive from justice.  Defs.' SOF ¶ 30.  The District therefore "instituted" "a criminal proceeding" against Plaintiff.  *DeWitt*, 43 A.3d at 296; *see also Pitt*, 491 F.3d at 504 (suggesting that a reasonable jury could conclude that an insufficient affidavit submitted to prosecutors could constitute malice for a malicious prosecution).  The District's motion is accordingly denied as to Count II.

### C.    Negligence

The court reaches a different conclusion with respect to Plaintiff's negligence claim.  Under District of Columbia law, "[t]he plaintiff in a negligence action bears the burden of proof on three

issues: 'the applicable standard of care, a deviation from that standard by the defendant, and a causal relationship between that deviation and the plaintiff's injury.'" *Toy v. District of Columbia*, 549 A.2d 1, 6 (D.C. 1988) (quoting *Meek v. Shepard*, 484 A.2d 579, 581 (D.C. 1984)). "A plaintiff must put on expert testimony to establish what the standard of care is if the subject in question is so distinctly related to some science, profession or occupation as to be beyond the ken of the average layperson." *Briggs v. Wash. Metro. Area Transit Auth.*, 481 F.3d 839, 845 (D.C. Cir. 2007) (quoting *District of Columbia v. Arnold & Porter*, 756 A.2d 427, 433 (D.C. 2000)). However, "no expert testimony is needed if the subject matter is within the realm of common knowledge and everyday experience." *Hill v. Metro. African Methodist Episcopal Church*, 779 A.2d 906, 908 (D.C. 2001) (quoting *Arnold & Porter*, 756 A.2d at 433).

In this case, the court concludes that an expert in police procedures concerning the processing of fugitive warrants is required to establish the applicable standard of care. *See Butera v. District of Columbia*, 235 F.3d 637, 659 (D.C. Cir. 2001) (observing in a case involving police procedures on undercover operations that an expert "must refer to commonly used police procedures, identifying specific standards by which the jury could measure the defendant's actions"). Plaintiff cites *Daskalea v. District of Columbia*, 227 F.3d 433, 445 (D.C. Cir. 2000), and *Wesby v. District of Columbia*, 765 F.3d 13, 30 (D.C. Cir. 2014), *rev'd on other grounds*, 138 S. Ct. 577 (2018), for the proposition that some negligence claims against law enforcement do not require expert testimony. It is true that there is no categorical rule that expert testimony is required to establish negligence in a case against law enforcement. But *Daskalea* and *Wesby* do not help Plaintiff's cause. *See Daskalea*, 765 F.3d at 445 (involving allegations of sexual abuse and harassment, assault, and forced stripping by correctional officers that clearly violate a reasonable standard of care); *Wesby*, 765 F.3d at 30 (holding no expert testimony required as to unlawful

12

arrest where a supervisor on the scene ordered the unlawful arrests, rather than an officer with less-informed judgment).  As this case involves police practices and procedures that are beyond the ken of an average layperson, expert testimony is required to establish the standard of care.  *Cf. Wesby,* 765 F.3d at 30 (observing that "the District correctly points out that courts often require expert testimony where the training and supervision of police officers is concerned").  Plaintiff, however, has not provided any expert testimony that purports to establish the standard of care that MPD officers owed Plaintiff.  Without such evidence, Plaintiff's claim cannot proceed to trial, and the court grants the District's motion with respect to Count III.

### D.    Count IV:  Section 1983 Claim Against Officer Agosto

#### *1.    Officer Agosto's Involvement in Plaintiff's Detention*

Having resolved Plaintiff's common law claims, the court turns to his claims under section 1983, starting with the individual claim against Officer Agosto.  The facts as they relate to Officer Agosto's actions are largely undisputed.  On October 23, 2016, MPD Officer Terence Sutton stopped Plaintiff for a traffic violation.  Defs.' SOF ¶ 1; Pl.'s SOF ¶ 1.  During the traffic stop, Officer Sutton conducted a license and criminal history check in the NCIC database and discovered an outstanding arrest warrant on a homicide charge from Will County, Illinois, for a person that matched Plaintiff's name, date of birth, and Social Security Number.  Defs.' SOF ¶¶ 2–6; Pl.'s SOF ¶¶ 2–6.[1]  Officer Sutton then arrested Plaintiff as a fugitive from justice.  Defs.' SOF ¶ 7; Pl.'s SOF ¶ 7.  The next day, an MPD officer with MPD's Fugitive Unit, Officer Ernest Cole, verified that the warrant on which Plaintiff had been arrested was "active and that Plaintiff would

---

[1] Plaintiff points out that the NCIC database also contained a second entry matching Plaintiff's identifiers, which indicated *not* to detain Plaintiff ("DO NOT DETAIN A VASQUEZ, JOSE . . . THIS IS NOT SUSPECT."), but which Officer Sutton did not review.  Pl.'s SOF ¶¶ 2–6.  But there is no allegation that Officer Agosto was aware of Officer Sutton's oversight, so that fact is not material to the Fourth Amendment claim against Officer Agosto.

be extradited on the warrant." Defs.' SOF ¶ 8; Pl.'s SOF ¶ 8. Officer Cole then prepared an affidavit in support of an arrest warrant, resulting in the fugitive-from-justice charge filed by the U.S. Attorney's Office.[2] Defs.' SOF ¶ 10; Pl.'s SOF ¶ 10. On October 28, 2016, Officer Agosto, also a member of the Fugitive Unit, emailed an officer with the Will County Sherriff's Office a photograph of Plaintiff along with biographical information and his fingerprints. Defs.' SOF ¶¶ 12–13; Pl.'s SOF ¶¶ 12–13. Although he was not assigned to Plaintiff's case, Officer Agosto undertook the task to determine whether Plaintiff was the person wanted by Will County, though he could not recall at whose request. Pl.'s Mot. for Leave, Dep. of Officer Ruben Agosto, Ex. H, ECF No. 87-14, at 10. Will County later determined that Plaintiff was not the person wanted on the fugitive warrant and sent a teletype message to the attention of the "MPD Warrant/Fugitive Squad," not Officer Agosto, indicating that any holds on Plaintiff should be released. Defs.' SOF ¶ 16; Pl.'s SOF ¶ 16; Defs.' Mot., Ex. 3, ECF No. 85-13. At the time, when a teletype was received that referenced a particular person, the practice was for the teletype operator to place it an outbox for pickup by the Fugitive Unit and to place a call to the Fugitive Unit to notify it of the teletype's receipt. Defs.' SOF ¶ 17; Pl.'s SOF ¶ 17; Def's Mot., Dep. of Tipi Brookins, Ex. 11, ECF No. 85-14, at 15–17. The record contains no indication that Officer Agosto either received a call about the Will County teletype or physically received the teletype on October 28, 2016. At the same time, Officer Agosto apparently undertook no steps to follow up on the confirmatory email he had sent to Will County. Pl.'s SOF ¶ 51; Defs.' Reply SOF ¶ 51. MPD did not notify the U.S. Attorney's Office about the teletype message from Will County until November 3, 2016, the day after Plaintiff first appeared for a bond hearing. Defs.' SOF ¶¶ 20–21; Pl.'s SOF ¶¶ 20–21. Officer

---

[2] Officer Cole likewise missed the NCIC entry indicating that Plaintiff should not be detained. Pl.'s SOF ¶ 8. But, again, Plaintiff does not contend that Officer Agosto was aware of Officer Cole's oversight, so that fact is not material to the Fourth Amendment claim against Officer Agosto.

Agosto forwarded the teletype to the U.S. Attorney's Office, *see* Defs.' SOF ¶¶ 20–21; Pl.'s SOF ¶¶ 20–21, though the record does not reveal when or how he came to possess it.  According to Plaintiff, as a result of Officer Agosto's "indifference," Plaintiff was unlawfully detained in violation of his rights under the Fourth Amendment.  Pl.'s Opp'n at 11.

### 2. Qualified Immunity as a Difficult, Exacting Standard

When, as here, an individual officer is sued for allegedly having violated a constitutional right, the question is often whether the officer is entitled to qualified immunity.  Government actors who perform "discretionary functions" are generally "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mitchell v. Forsyth*, 472 U.S. 511, 517 (1985) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Qualified immunity provides "ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 335 (1986).  "An official sued under § 1983 is entitled to qualified immunity unless it is shown that the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Plumhoff v. Rickard*, 572 U.S. 765, 778 (2014) (citation omitted) (internal quotation marks omitted).

The court's analysis has two parts.  To defeat a defense of qualified immunity, a plaintiff must show that: (1) "an official 'violated a constitutional right'" and (2) "'the right was clearly established' at the time of the violation." *Fenwick v. Pudimott*, 778 F.3d 133, 137 (D.C. Cir. 2015) (quoting *Saucier v. Katz*, 533 U.S. 194, 200–01 (2001)).  A right can be "clearly established" only if it is "sufficiently clear that every reasonable officer would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (citation omitted) (internal quotation marks omitted).  Courts "do not require a case directly on point, but existing precedent must have

placed the statutory or constitutional question beyond debate." *Id.* at 12 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). The rule should be "settled law"—not simply precedential, but so clear through "controlling authority or a robust consensus of cases of persuasive authority" that "every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589–90 (2018).

### 3.     *Plaintiff Cannot Hold Officer Agosto Liable*

Plaintiff cannot meet his burden to overcome Officer Agosto's claim of qualified immunity. Plaintiff alleges that Officer Agosto's actions led to his "being illegally detained in contravention [of] the Fourth Amendment."[3] Third Am. Compl. ¶ 95. Plaintiff, however, cites no case from the Supreme Court or this Circuit that would hold an officer accountable in circumstances like those faced by Officer Agosto. Indeed, the post-arrest constitutional obligations of an officer under the Fourth Amendment are uncertain.

To be sure, multiple circuits have held that officers "may not disregard facts" available to them "tending to dissipate probable cause" *before* making a warrantless arrest. *Bigford v. Taylor*, 834 F.2d 1213, 1218 (5th Cir. 1988); *see also United States v. Pabon*, 871 F.3d 164, 175–76 (2d Cir. 2017); *United States v. Ortiz-Hernandez*, 427 F.3d 567, 574 (9th Cir. 2005); *cf. Harte v. Bd. of Comm'rs*, 864 F.3d 1154, 1182 (10th Cir. 2017) (stating that "even when law-enforcement officers obtain a proper search warrant, probable cause may dissipate before the warrant's execution, rendering the search unreasonable under the Fourth Amendment").

However, courts have not often considered "dissipation in the context of new information emerging *after* a warrantless arrest based on probable cause." *Pabon*, 871 F.3d at 175. The Second

---

[3] Officer Agosto does not argue that Plaintiff has failed to show a violation of the Fourth Amendment, so the court does not address that first step of the qualified immunity inquiry.

Circuit has observed that "[t]he core obligation the Fourth Amendment imposes on the police at this stage is to ensure that 'persons arrested without a warrant . . . promptly be brought before a neutral magistrate for a judicial determination of probable cause.'" *Id.* at 175–76 (quoting *County of Riverside v. McLaughlin*, 500 U.S. 44, 53 (1991)).  "It is then the magistrate's job to determine 'whether there is probable cause for detaining the arrested person pending further proceedings.'" *Id.* at 176 (quoting *Gerstein v. Pugh*, 420 U.S. 103, 120 (1975)).  "Other than the obligations clearly imposed by *Gerstein* and *McLaughlin*," which require an officer to present a warrantless arrestee to a magistrate and for that magistrate to determine probable cause, "the Supreme Court has never indicated that the police have a specific Fourth Amendment obligation in the aftermath of a warrantless arrest continually to reevaluate whether the available evidence still definitively supports the initial probable cause determination." *Id.*

That is nearly the situation in which Officer Agosto found himself.  Officer Agosto was responsible neither for Plaintiff's arrest nor initiating his fugitive charge in October 2016.  Officers Sutton and Cole, respectively, performed those tasks.  Defs.' SOF ¶¶ 6, 8; Pl.'s SOF ¶¶ 6, 8.  It is therefore unclear what, if any, Fourth Amendment obligation Officer Agosto had at that point.  But even if the court were to assume that in some circumstances the Fourth Amendment requires an officer to release a detainee "where probable cause has unequivocally dissipated, rendering further detention prior to the magistrate's determination unreasonable," *id.* at 177, the facts here do not support that Officer Agosto knew that probable cause had "unequivocally dissipated."  Although Plaintiff attests that he "repeatedly informed MPD officers during his arrest and detention that he was not the person wanted in the Will County warrants," he nowhere claims that Officer Agosto was on the receiving end of those pleas.  Pl.'s SOF ¶ 39; Defs.' Reply SOF ¶ 39.

17

Furthermore, there is no evidence that Officer Agosto was notified of the Will County teletype, let alone that he had received it and became aware of its directive to release Plaintiff.  At most, the evidence might support a failure to follow up by Officer Agosto, but this cannot support Plaintiff's claim.  First, Plaintiff has offered no case that establishes a duty to follow up.  And second, Plaintiff has not provided the court with any proof of internal MPD policies or procedures—formal or informal—that would have obligated Officer Agosto to follow up on his inquiry with Will County.  After all, Officer Agosto was not assigned to the case, and the practice in place at the time did not call for Officer Agosto specifically, as opposed to the Fugitive Unit generally, to be notified of the teletype.  Based on the present record, the court finds that Officer Agosto is entitled to qualified immunity and enters judgment in his favor.[4]

### E.        Counts V, VI, and VII:  *Monell* Claims Against the District of Columbia

The court now turns to Plaintiff's section 1983 claims against the District of Columbia. A municipality, like the District of Columbia, cannot be subject to suit under section 1983 through what amounts to a *respondeat superior* theory of liability.  *See Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 691, 694 (1978); *see also Triplett v. District of Columbia*, 108 F.3d 1450, 1453 (D.C. Cir. 1997).  Only when "a government's policy or custom . . . inflicts the injury" is a government body as an entity liable under section 1983.  *Monell*, 436 U.S. at 694.  Thus, a *Monell* claim requires "a predicate constitutional violation" caused by a "custom or policy of the municipality."  *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003).  Courts have

---

[4] Officer Agosto prepares for the possibility that Plaintiff could seek (or that the court could construe Plaintiff's claim) to hold him liable under section 1983 for violating his Fifth Amendment rights, but Plaintiff does not advance that claim in his Third Amended Complaint.  *See* Third Am. Compl. at 21 (titling claim "*Monell* Claim under the Fourth Amendment"); *id.* ¶ 95 (alleging only that "he was being illegally detained in contravention to the Fourth Amendment").  The court therefore does not reach Plaintiff's contention that Officer Agosto's deliberate indifference resulted in a deprivation of due process.

recognized multiple ways in which a "custom or policy" can support municipal liability.  First, municipal liability will lie when a policy explicitly violates the Constitution.  *Baker*, 326 F.3d at 1306 (citing *Monell*, 436 U.S. at 694–95).  Second, it applies when a policymaker's acts violate the Constitution.  *Baker*, 326 F.3d at 1306 (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123–30 (1988)).  Third, a municipality can be held liable where it "adopt[s]" a violation through a "knowing failure to act by a policy maker of actions by his subordinates that are so consistent that they have become 'custom.'"  *Baker*, 326 F3d at 1306 (citing *Praprotnik*, 485 U.S. at 130).  Finally, *Monell* liability exists for a government's failure to "respond to a need (for example, training of employees) in such a manner as to show 'deliberate indifference' to the risk that not addressing the need will result in constitutional violations."  *Baker*, 326 F.3d at 1306 (citing *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)).

Plaintiff brings three claims against the District of Columbia under section 1983 for violations of his Fifth Amendment right to due process.  Third Am. Compl. ¶¶ 103, 110, 116. Plaintiff's first count, Count V, asserts that "MPD policy and custom regarding the transmission of incoming teletype fugitive warrant messages from the Teletype Unit to the Fugitive Unit . . . and the distribution of . . . fugitive warrant teletype messages within the Fugitive Unit[] all but ensured that critical messages . . . would be delayed, misplaced and/or mishandled."  *Id.* ¶ 101. Further, Plaintiff asserts that MPD "did nothing to correct or improve its policies and customs" even though this mishandling was "common, if not frequent."  *Id.* ¶ 102.

The second claim, set forth in Count VI, asserts that "MPD's policies and customs directed officers to ignore critical information in MPD's own files and in the arrest records concerning the prior disposition of fugitive warrant cases."  *Id.* ¶ 108.  Specifically, Plaintiff contends that MPD's "policies and customs directed officers to ignore critical information in the NCIC database" that

would have notified them that Plaintiff was not the person wanted by the Will County arrest warrant. *Id.* ¶ 107. He also alleges that MPD's "policies and customs directed officers to provide only name and date of birth—and to ignore Social Security Numbers—in submitting 'hit-and-locate' requests," which led to Plaintiff's erroneous detention. *Id.* ¶ 109. Thus, both Counts V and VI appear to be predicated on a "custom or policy" theory of *Monell* liability.

Count VII, in contrast, is premised on a failure to train. Plaintiff alleges that the "[t]he District of Columbia failed adequately to supervise and train MPD officers with respect to the proper handling of and attention to incoming teletype messages exonerating persons being held on fugitive warrants." *Id.* ¶ 114. Further, he maintains that the District "failed adequate[ly] to supervise and train MPD officers to conduct thorough reviews of NCIC reports" and "to supervise and train MPD office[r]s to use all available personal identifiers, including Social Security Numbers, when making 'hit-and-locate' requests." *Id.* He also alleges the District provided inadequate training and supervision to officers in entering "sufficient information in electronic databases to prevent recurring arrests" of persons like Plaintiff and reviewing prior case history and other information to confirm the identity of a person in custody as a fugitive. *Id.*

Plaintiff has not offered sufficient evidence to support any of these theories to defeat summary judgment. When a plaintiff seeks to establish "custom and policy" municipal liability under section 1983, in the absence of an express policy, he must "present concentrated, fully packed, precisely delineated scenarios" as proof that an unconstitutional policy or custom exists. *Parker v. District of Columbia*, 850 F.2d 708, 712 (D.C. Cir. 1988) (citation omitted) (internal quotations marks omitted). Put differently, "custom or practice" liability ordinarily is premised on "practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011); *see also Praprotnik*, 485 U.S. at 130 (recognizing that "if a

series of decisions by a subordinate official manifested a 'custom or usage' of which the supervisor must have been aware" then "the supervisor could realistically be deemed to have adopted a policy").  Because of this high burden, cases involving "deliberate municipal evasions of the Constitution will be sharply limited." *Praprotnik*, 485 U.S. at 130.

The proof required to establish a failure to train is no less rigorous.  Such a theory requires a showing that the government failed to adequately train its employees "in such a manner as to show 'deliberate indifference' to the risk that not addressing the need will result in constitutional violations." *Baker*, 326 F.3d at 1306.  This requires proof that "city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights." *Connick*, 563 U.S. at 61.  Failure-to-train liability usually requires showing a "pattern of similar constitutional violations by untrained employees," but, on rare occasions, a single unconstitutional incident may be sufficient to show deliberate indifference. *See id.* at 62–63.  A municipality's "culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Id.* at 61.

The fatal flaw with Plaintiff's *Monell* claims under all counts is that he has offered no evidence that MPD routinely holds fugitives in error.  Indeed, Plaintiff identifies no other person whom MPD has held on a fugitive warrant for any period based on mistaken identity, as happened to Plaintiff, or any other person that has suffered a re-arrest, as Plaintiff did, on a warrant that was previously determined not to apply to him.  Without such evidence, Plaintiff cannot establish "practices so persistent and widespread as to practically have the force of law" or a "pattern of similar constitutional violations by untrained employees." *Connick*, 563 U.S. at 61–63.

Plaintiff notes that once or twice per month MPD receives teletype messages advising that a person held is not the person sought by a fugitive warrant, *see* Pl.'s Opp'n at 18, but he identifies

no other occasion, other than his own detention, when such a message was ignored or mishandled, resulting in an improper detention.  Plaintiff also asserts that, "[a]t least 10 times per month," MPD fails to "provide timely information from jurisdictions outside the District of Columbia regarding persons being held on fugitive warrants."  *Id.* at 19.  The evidentiary basis for that claim is dubious—it relies on what a witness "heard" without identifying from whom she heard that statistic.  *See* Defs.' Mot., Dep. of Shavaka Melvin, Ex. 20, ECF No. 85-23, at 26.  But, in any event, even if the statistic is true, it tells the court nothing about how often untimely reporting results in improper detentions or mistaken re-arrests.

And there is an equally glaring evidentiary omission in Plaintiff's failure-to-train theory: he offers no proof at all about how MPD officers are trained with respect to confirming the identities of persons arrested on fugitive warrants.  Plaintiff asserts various flaws in the system that led to Plaintiff's wrongful detentions, *see* Pl.'s Opp'n at 18, but nowhere does he show that those flaws are the result of deficient training.

Accordingly, the District's Motion is granted with respect to Counts V, VI, and VII.

## V.  CONCLUSION AND ORDER

Defendants' Motion for Summary Judgment is granted in part and denied in part.  With respect to the section 1983 claim against Officer Agosto, Officer Agosto is entitled to qualified immunity as a complete defense, so his motion with respect to Count IV is granted.  With respect to the *Monell* claims against the District of Columbia, the motion as to Counts V, VI, and VII is likewise granted.

As for Plaintiff's common law claims, the District's motion as to Counts I (false imprisonment) and II (malicious prosecution) are denied, but the motion is granted as to Count III (negligence).  The court will retain supplemental jurisdiction over Counts I and II.  *See Women*

*Prisoners v. District of Columbia*, 93 F.3d 910, 920 (D.C. Cir. 1996) (allowing supplemental jurisdiction at judicial discretion).

The parties shall appear for a remote status conference to discuss a schedule for further proceedings on October 20, 2021, at 10:30 a.m.

Dated:  September 30, 2021

Amit P. Mehta
United States District Court Judge