# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **JOSE T. VASQUEZ,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil No. 17-cv-02194 (APM)** |
| ) | |
| **DISTRICT OF COLUMBIA, *et al.*,** ) | |
| ) | |
| **Defendants.** ) | |

## <u>MEMORANDUM OPINION</u>

### I.   INTRODUCTION

Plaintiff Jose T. Vasquez has the misfortune of sharing the same name, date of birth, and physical description as a Jose T. Vasquez wanted for murder in Will County, Illinois. As a result of administrative errors, Plaintiff has been arrested and detained multiple times on a warrant issued for the other Jose T. Vasquez. Two of those arrests occurred in the District of Columbia. One of those arrests—an overnight detention that occurred on March 3–4, 2017—was the subject of a two-day trial on claims of false imprisonment and malicious prosecution. Plaintiff prevailed on the former claim but not the latter, and the jury awarded him $100,000 in damages.

Defendant District of Columbia brings the instant motion seeking judgment as a matter of law, on the grounds that there was insufficient evidence for a reasonable jury to find that the District was liable for false imprisonment. Def.'s Renewed Mot. for Judg. as a Matter of L. or, Alternatively, for a New Trial or for Remittitur, ECF No. 126 [hereinafter Def.'s Mot.]. In the alternative, the District moves for a new trial or remittitur. *Id.* For the reasons that follow, the

court grants the District's motion for judgment as a matter of law.  In the alternative, the court would grant the District's motion for remittitur.

## II.    BACKGROUND

### A.    Trial Evidence

The trial evidence, taken in the light most favorable to Plaintiff, showed as follows.

*March 3, 2017.*  On the morning of March 3, 2017, U.S. Secret Service Officer Joseph Sanford arrested Plaintiff in the District of Columbia following a traffic stop.  Jury Trial Tr. (draft), May 9, 2022 [hereinafter May 9 Tr.], at 154–55; Def.'s Mot., Ex. B, ECF No. 126-3 [hereinafter Arrest Packet], at 2 (listing "Joseph Sanford" as "arresting officer"); Def.'s Mot, Ex. C, ECF No. 126-4 [hereinafter Offense Rep.], at 6 (listing time as 9:10 a.m.).  Officer Sanford informed Plaintiff that there was an active murder warrant for his arrest in Will County.  He then transported Plaintiff to George Washington University Hospital to treat injuries sustained during his arrest, before bringing him to the Metropolitan Police Department's ("MPD") Second District precinct for booking.  May 9 Tr. at 179; Offense Rep. at 6.  Plaintiff claimed his innocence throughout, both to Officer Sanford and the MPD officers at the Second District.  May 9 Tr. at 158–59.  The MPD officers called him a "liar."  *Id.* at 159.  Plaintiff was booked around 5:00 p.m. at the MPD's Second District.  Offense Rep. at 2, 18.  Officer Sanford then took Plaintiff to the Central Cell Block located under MPD headquarters, Jury Trial Tr. (draft), May 10, 2022 [hereinafter May 10 Tr.], at 408, where Plaintiff was detained overnight, May 9 Tr. at 162.

*March 4, 2017.*  Sometime the next morning, Plaintiff was brought from the Central Cell Block to the U.S. Marshals' cell block under the D.C. Superior Court, where he waited to be arraigned before a magistrate judge.  *Id.* at 185–86; May 10 Tr. at 413.  Around 10:00 a.m., Officer Leroy Rollins of MPD's Fugitive Unit received the day's "lockup list," which showed that Plaintiff

was arrested as a fugitive from justice.  May 10 Tr. at 344–45, 349.  Around 11:40 a.m., Officer Rollins processed the charge by running Plaintiff's name, date of birth, and sex identifier (male) through the NCIC database "to see if [Plaintiff], in fact, ha[d] a warrant that the agency had charged him with." *Id.* at 349–50, 356–57.  NCIC reports provide an arrestee's name, date of birth, physical description, the criminal charge, date of warrant, and warrant number.  *Id.* at 357.  Officer Rollins testified that the NCIC Report that he received, which was based on information input by Will County into the NCIC database, showed that "the subject that was in custody was wanted on a failure to appear, homicide, willful kill charge from Will County Sheriff's Office," *id.* at 360, and that Plaintiff's "name, date of birth, and physical description" matched the information in the NCIC Report, *id.* at 358.  *See* Def.'s Mot., Ex. D, ECF No. 126-5 [hereinafter NCIC Rep.], at 2.

Officer Rollins then reviewed Plaintiff's arrest packet, which included Officer Sanford's description of the arrest.  May 10 Tr. at 351–52.  Officer Sanford had written that there was a "felony warrant out of Illinois" for Plaintiff, "[t]he Joint Operations Center confirmed the warrant out of Will County, Illinois," and "[t]he Will County Sheriff's Department provided a photograph which matched" Plaintiff.  Arrest Packet at 3.  Officer Rollins testified that, based on the arrest packet, he understood "[t]hat the Will County Sheriff's office confirmed a warrant[,] they provided a photograph of the [fugitive] which matched [Plaintiff Vasquez]," and the photograph "confirm[ed] the identity of the wanted subject."  May 10 Tr. at 356.  Officer Rollins said that he relied on the Secret Service's investigation which concluded that Plaintiff was the person wanted by the Will County warrant.  *Id.* at 393.

The sole identifying difference between Plaintiff Vasquez and the Jose T. Vasquez wanted by Will County was their Social Security numbers.  The NCIC Report showed that "the person wanted by Will County ha[d] a Social Security number [ending in] 7680," whereas the arrest

packet showed that Plaintiff's Social Security number ended in 8472. *Id.* at 293–94; *see* NCIC Rep. at 2; Arrest Packet at 2.

Officer Rollins testified that the different Social Security numbers did not raise a "red flag" for him about Plaintiff's identity. May 10 Tr. at 294–95. He did not follow up on the difference because he had "use[d] other avenues to confirm" that Plaintiff was the person wanted by Will County. *Id.* at 296. In his experience, he gave "very minimal" weight to Social Security numbers as an identifier. *Id.* at 362–63. "Subjects try to hide their identity [from] law enforcement," he explained, so it was not unusual for a suspect to give a different Social Security number than their actual one. *Id.* at 363. In his view, "[n]o way" was the mismatch in Social Security numbers exonerating. *Id.* He also said that he had never, in his experience, "sent a question to any jurisdiction pertaining to a Social Security number." *Id.* at 298.

After reviewing Plaintiff's arrest packet, Officer Rollins sent a teletype request to Will County at 12:21 p.m., *id.* at 302, to "confirm that the warrant was active and that [Will County would] extradite," *id.* at 364. The purpose of sending the teletype was not to verify Plaintiff's identity. *Id.* After not receiving a response, the teletype unit followed up with a second message. *Id.* at 304. Will County then "confirmed that the warrant was still active and they [would] extradite [Plaintiff] from the District of Columbia." *Id.* at 356; *see* Def.'s Mot., Ex. F, ECF No. 126-7, at 2.

Sometime after 2:30 p.m., Officer Rollins signed an affidavit and presented it to the U.S. Attorney's Office. May 10 Tr. at 366–67. An Assistant U.S. Attorney and a Superior Court clerk also signed the affidavit. *See* Def.'s Reply in Further Supp. of Mot., ECF No. 130 [hereinafter Def.'s Reply], Ex. L, ECF No. 130-1 [hereinafter Rollins Affidavit]. At that point, Officer Rollins's role in the case largely ended. May 10 Tr. at 368. Later that day, for reasons not specified at trial, a Superior Court magistrate judge dismissed Plaintiff's case. May 9 Tr. at 163–

64.  The time of Plaintiff's release was not definitively established at trial but likely occurred sometime in the late afternoon.  Pl.'s Opp'n to Def.'s Mot, ECF No 128 [hereinafter Pl.'s Opp'n], at 14.

*Prior Arrest in the District.*  Plaintiff's arrest and detention on May 3, 2017, was not his first in the District of Columbia on the Will County warrant—Plaintiff was arrested and detained on October 23, 2016, by an MPD officer following a traffic stop.  May 9 Tr. at 155–56, 167, 211. Five days later, on October 28, 2016, MPD sent Plaintiff's photograph and fingerprints to the Will County Sheriff's Office in order to confirm that he was the Jose Vasquez wanted by the warrant. *Id.* at 210–11.  The Will County Sherriff's Office responded that day, telling MPD to "release any holds" on Plaintiff because "[t]he person [MPD was] holding is not the same person [Will County was] looking for."  *Id.* at 205, 212; *see* Def.'s Mot, Ex. A, ECF No. 126-2.  The fugitive case against Plaintiff was ultimately dismissed on November 3, 2016, *id.* at 214, around six days after Will County notified MPD that Plaintiff was not the Jose Vasquez wanted by the warrant.[1]

Officer Rollins testified that, on May 4, 2017, he was not aware that Plaintiff had previously been wrongfully detained in the District on the Will County warrant.  May 9 Tr. at 301.  He did not check a computer database known as JUSTIS to inquire about any prior extradition matters against Plaintiff, and he did not know that there was an existing file in the Fugitive Unit about Plaintiff's prior arrest.  *Id.* at 300–01.

---

[1] Plaintiff had brought claims against the District regarding the October 2016 wrongful detention, but the court disposed of those prior to trial.  The court permitted some limited testimony about the October 2016 events to establish Plaintiff's particular vulnerability for emotional distress during the wrongful arrest contested at trial.  Jury Trial Tr. (draft), May 2, 2022, at 50–51.  The court only permitted Plaintiff to elicit limited testimony about the October 2016 arrest and detention until the District, through its cross-examination, opened the door to greater detail about those events.  May 9 Tr. at 167–74.

B.      Jury Instructions

At summary judgment, the court permitted Plaintiff to proceed on only a "duty to release" theory of false imprisonment for the March 3–4, 2017 detention, because there was no contention that MPD had improperly detained Plaintiff at the outset.  *See Vasquez v. Cnty. of Will, Illinois*, No. 17-cv-02194 (APM), 2021 WL 4476766, at *4 (D.D.C. Sept. 30, 2021).  Secret Service had executed the arrest, presented Plaintiff to the Second District, and transported him to the Central Cell Block.  It was only from that point forward that MPD could be held liable for false imprisonment.  Such liability therefore had to be predicated, if at all, on the theory that MPD had a duty to release Plaintiff but failed to do so.  *See id.*

Accordingly, the court instructed the jury that, to prove false imprisonment, Plaintiff had to establish two elements: (1) "MPD officers detained Mr. Vasquez against his will" and (2) "the detention was unlawful."  Jury Instructions, ECF No. 124 [hereafter Jury Instructions], at 8.  The court further instructed that, "[w]ith respect to the second element—that the detention was unlawful—false imprisonment can occur even if the confinement began lawfully but has become unlawful over time."  *Id.*  The instruction continued:

> False imprisonment occurs when a defendant is under a duty to release the plaintiff but does not do so.  If the defendant is under a duty to release a plaintiff from confinement, the defendant's refusal to do so with the intention of confining the plaintiff is a sufficient act of confinement to make the defendant liable for false imprisonment.

*Id.*  The instructions defined the circumstances that would give rise to a "duty to release":

> Whether MPD had a duty to release Mr. Vasquez depends upon the belief of its officers that Mr. Vasquez was the person named or otherwise described in the Will County warrant with such sufficiency as to justify their belief that he was the person wanted by Will County.  If officers of the MPD later learned that Mr. Vasquez was *undoubtedly* not the person wanted by the

6

> Will County warrant, MPD was required to release Mr. Vasquez
> unless he objected to his release.

*Id.* at 8–9 (emphasis added).

## III.    LEGAL STANDARD

*Motion for Judgment as a Matter of Law.*  A court may grant judgment as a matter of law "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." FED. R. CIV. P. 50(a)(1).  Courts "do not, however, lightly disturb a jury verdict." *McGill v. Munoz*, 203 F.3d 843, 845 (D.C. Cir. 2000) (internal quotation marks omitted).  "Judgment as a matter of law is appropriate only if the evidence and all reasonable inferences that can be drawn therefrom are so one-sided that reasonable men and women could not have reached a verdict in plaintiff's favor." *Id.* (internal citation omitted).  "[I]f a party moved for judgment as a matter of law during a jury trial and the court declined to grant the motion, the party may file a renewed motion after trial reasserting his request for an entry of judgment in his favor." *Amobi v. Brown*, No. 08-cv-1501 (KBJ), 2021 WL 3722710, at *6 (D.D.C. Aug. 23, 2021).  The District moved for judgment as a matter of law at the conclusion of Plaintiff's case, May 10 Tr. at 315–17, and renewed the motion at the close of the District's case, *id.* at 467–69.  The District now renews its motion under Federal Rule of Civil Procedure 50(a).

*Motion for Remittitur.*  "Federal trial courts may review jury awards of damages for excessiveness and may order remittitur or a new trial where damages are found excessive." *Jean-Baptiste v. District of Columbia*, 931 F. Supp. 2d 1, 12 (D.D.C. 2013).  "Courts may not set aside a jury verdict merely deemed generous; rather, the verdict must be so unreasonably high as to result in a miscarriage of justice." *Langevine v. District of Columbia*, 106 F.3d 1018, 1024 (D.C. Cir. 1997).  The D.C. Circuit "allows remittitur of jury verdicts only if the reduction

'permit[s] recovery of the highest amount the jury tolerably could have awarded.'" *Id.* (quoting *Carter v. District of Columbia*, 795 F.2d 116, 135 n. 13 (D.C. Cir. 1986)).  "A court must be especially hesitant to disturb a jury's determination of damages in cases involving intangible and non-economic injuries."  *Id.*  When a court grants a remittitur, the plaintiff has a right to either accept the reduced award or have a new trial.  *Hetzel v. Prince William Cnty.*, 523 U.S. 208, 210 (1998).

## IV.     MOTION FOR JUDGMENT AS A MATTER OF LAW

### A.     Sufficiency Based on Mismatched Social Security Numbers

The District asks the court to grant judgment as a matter of law on Plaintiff's false imprisonment claim "because the evidence presented at trial did not establish when—*if ever*—members of the Metropolitan Police Department were 'undoubtedly' aware that Plaintiff was not the man wanted on a fugitive from justice warrant issued by Will County, Illinois."  Def.'s Mot. at 1.[2]  "As the Court's instruction provided, MPD was required to release Plaintiff only if it learned he was *undoubtedly* not the person wanted by the warrant," the District argues, and "[t]here is no evidence from which a reasonable juror could find that MPD Officer Rollins learned that Plaintiff undoubtably [sic] was not the person wanted by the warrant."  *Id.* at 20.  Because "it was not [Officer Rollins's] duty to verify the identity of the suspect" and "the U.S. Secret Service had already verified Plaintiff's identity through a photograph as noted in the arrest packet," the District continues, "Officer Rollins had no reason to doubt the reliability of this positive identification," and he was "entitled to rely on the representations made by the U.S. Secret Service officer."  *Id.* at 21.  "Based on [the] jury instruction and Officer Rollins's testimony—a reasonable jury would not

---

[2] The court uses ECF pagination for this motion.

have had a legally sufficient evidentiary basis to find for Plaintiff on the false imprisonment claim and, therefore, the District is entitled to judgment as a matter of law." *Id.* at 20.

Plaintiff's defense of the verdict centers on the fact that Plaintiff Jose T. Vasquez and the Jose T. Vasquez sought by the Will County warrant had different Social Security numbers. Pl.'s Opp'n at 1–3.[3]  "Officer Rollins reviewed the warrant and specifically read that the warrant sought a person named 'Jose Vasquez' with a Social Security number ending in 7680," whereas the arrest packet for Plaintiff, which Officer Rollins also reviewed, showed that Plaintiff had Social Security number ending on 8472.  *Id.* at 1–2[4]; *see* May 10 Tr. at 293–94.  Thus, according to Plaintiff, when "Officer Rollins learned that Plaintiff Vasquez had a *different* Social Security number than the 'Jose Vasquez' sought in the Will County warrant," he necessarily "learned that Plaintiff Vasquez undoubtedly was not the person sought."  Pl.'s Opp'n at 2.

"[T]he question before [this court] is whether reasonable persons could have concluded on the basis of the evidence presented at the trial" that Officer Rollins *undoubtedly* knew that Plaintiff was not the Jose Vasquez wanted by the Will County warrant.  *Murphy v. United States*, 653 F.2d 637, 640 (D.C. Cir. 1981).  The court finds that, on this record, no reasonable jury could have concluded that a mere difference in Social Security numbers meant that Officer Rollins *undoubtedly* knew that Plaintiff was not the Jose T. Vasquez described in the Will County warrant and thus had a duty to release him.

---

[3] Plaintiff further contends that MPD Officer Rollins "prepared and signed a sworn affidavit attesting not only that he had verified that the Will County warrant was still active, *but also that he had verified that plaintiff Vasquez was the person sought in the warrant.*"  Pl.'s Opp'n at 1.  The District argues that "[t]here is nothing in the affidavit or record to support this argument."  Def.'s Reply at 2.  The court agrees that the affidavit does not state that Officer Rollins verified that Plaintiff was the person sought in the warrant.  It merely states: "On 03/04/2017 the warrant was verified" by Officer Rollins "through NCIC/WALES check, advising that the warrant is active and they will extradite."  Rollins Affidavit.

[4] Plaintiff's opposition states that "the arrest packet for Plaintiff Vasquez . . . showed that the person *sought by Will County* had a Social Security number ending in 8472."  Pl.'s Opp'n at 2 (emphasis added).  The court believes this is a typographical error, as Officer Rollins's testimony confirmed that Plaintiff Jose Vasquez has a Social Security number ending in 8472.  *See* May 10 Tr. at 294.

Officer Rollins explained why he believed Plaintiff was the person wanted by Will County. He initially relied on the Secret Service Officer's arrest and investigation.  The paperwork the Secret Service prepared, and that Officer Rollins reviewed, stated that the "Joint Operations Center confirmed the warrant out of Will County, Illinois" and the "Will County's Sheriff's Department provided a photograph which matched [Plaintiff]."  Arrest Packet at 3.  Plaintiff presented no evidence to undermine the reasonableness of Officer Rollins's reliance on the Secret Service's confirmation of Plaintiff as the person wanted by Will County.  In fact, the head of the Fugitive Unit, Sergeant Craig Mack, testified that it was "common practice" to rely on information in arrest packets.  May 10 Tr. at 397, 410.

Next, Officer Rollins verified that Plaintiff's name, date of birth, and description matched the suspect described in the warrant.  Sergeant Mack testified that it was exceedingly rare for a person whose name and date of birth matched those associated with a fugitive warrant not to be the wanted individual.  *Id.* at 419.  To be sure, Officer Rollins did admit to noticing the difference in Social Security numbers, but he said he gave that factor "minimal" weight because, in his experience, arrestees use different names and Social Security numbers "to hide their identity [from] law enforcement."  *Id.* at 362–63.  When asked if "a Social Security number mismatch would be exonerating," he responded, "[n]o way."  *Id.* at 363.  Officer Rollins further testified that: (1) he never "had a suspect with the same exact date of birth [and] with the same name and have it not be the suspect that's wanted"; (2) that it was not his "job to verify the identity of the suspect"; and (3) that he had no "reason to doubt" that Plaintiff Vasquez was the suspect wanted by the warrant.  *Id.* at 393.  Again, Plaintiff offered no evidence to contradict this testimony.  He did not, for example, produce an MPD policy that required Officer Rollins to reconcile the Social Security number discrepancy.  Additionally, no witness testified that a mere mismatch in Social Security

numbers required release of a suspect.  The closest Plaintiff came was to elicit from Sergeant Mack

that a difference in Social Security numbers was something that "can be looked into."  May 10 Tr.

at 447.  But Sergeant Mack also said that such a difference was not "an automatic disqualifier."

*Id.*

The court did not define "undoubtedly" for the jury but the Restatement of Torts section

from which the court derived the instruction provides an example of the kind of certitude of

misidentification that an officer must have before a duty to release arises.  Comment f of the

Restatement of Torts (Second) § 134 is titled "Actor's duty to release other."  RESTATEMENT

(SECOND) OF TORTS § 134 cmt. f.  It provides that:

> [T]he privilege to arrest under a warrant depends upon the actor's
> belief that the person arrested is the person named or otherwise
> described in the warrant with such sufficiency as to justify the actor
> in believing him to be the person intended.  If, therefore, the actor
> subsequently learns that the other is *undoubtedly* not the person
> intended, he must release the other unless the other objects.

*Id.* (emphasis added).  The Restatement then provides the following illustration:

> A, a peace officer, arrests B, reasonably believing that C has been
> murdered and that B has committed the murder.  While A has B in
> custody, he meets C, who is alive and well.  A is not privileged to
> keep B in custody, unless B, on being offered his release, desires to
> be taken before a magistrate.

*Id.*  The evidence presented in this case falls well short in comparison.

Here, Officer Rollins knew only that Plaintiff's Social Security number was different than

that of the Jose T. Vasquez wanted by Will County.  But every other indicia of identification—

name, date of birth, and description—matched.  And he believed that Secret Service had secured

a photographic match.  That evidence is a far cry from the degree of exactitude required to give rise to a duty to release.[5]

The court's conclusion about the insufficiency of the evidence is buttressed by the fact that the jury found for the District on Plaintiff's malicious prosecution charge.  The jury instructions for the malicious prosecution charge required the jury to find that Officer Rollins "lacked probable cause to institute the criminal proceeding against Mr. Vasquez" and "acted with malice," which the court defined as "wanton or reckless disregard for the rights of the plaintiff."  *See* Jury Instructions at 9–10.  The jury evidently concluded that Officer Rollins did have probable cause to initiate Plaintiff's prosecution, or that he did not act recklessly, or both.  Yet, the same jury concluded that Officer Rollins "undoubtedly" knew Plaintiff was not the person wanted by Will County *before* he completed the affidavit that initiated the fugitive case.[6]  Those two conclusions cannot be reconciled on this record.

### B.    Sufficiency Based on Other Evidence

Plaintiff's remaining sufficiency arguments cannot save the verdict.  Plaintiff argues that, even if the different Social Security numbers were insufficient to show that Officer Rollins undoubtedly knew Plaintiff "was not the person wanted by Will County, District of Columbia law does not allow Officer Rollins's indifference toward the differing Social Security numbers to bar liability for false imprisonment."  Pl.'s Opp'n at 3.  Plaintiff cites to *Sanders v. United States* in support of the proposition that, "[s]hould doubt as to the correct identity of the subject of warrant arise, the arresting officer obviously should make immediate reasonable efforts to confirm or deny

---

[5] Further demonstrating the high degree of certainty required before a duty to release arises is the Restatement's description of that duty in the context of a warrantless arrest.  In that case, an arresting officer is no longer privileged to keep a person in custody if he "has ascertained beyond a reasonable doubt that the suspicion upon which the privilege to arrest is based is unfounded."  RESTATEMENT (SECOND) OF TORTS § 134, cmt. f.  Here, the suspicion upon which Plaintiff was arrested was not dispelled "beyond a reasonable doubt."

[6] There was no evidence presented that Office Rollins learned anything new about Plaintiff *after* he submitted and signed the affidavit.

the applicability of the warrant to the detained individual." 339 A.2d 373, 379 (D.C. 1975). He argues that the different Social Security numbers provide "[c]lear evidence" that Plaintiff was not the person wanted by the Will County warrant, and that "[t]he District cannot escape liability merely because Officer Rollins turned a blind eye to the exonerating information." Pl.'s Opp'n at 3.

*Sanders* is analogous to the instant case in one sense: the defendant in *Sanders*, like Plaintiff, was arrested pursuant to a "warrant [that] actually was for the arrest of another man." 339 A.2d at 375. But that is where the similarities end. *Sanders* is not a false imprisonment case but a criminal case regarding whether evidence must be suppressed if gathered pursuant to a valid warrant that called for the arrest of a person other than the defendant. *Id.* The D.C. Court of Appeals held that, with a constitutionally valid warrant, "the seizure of an individual other than the one against whom the warrant is outstanding is valid if the arresting officer (1) acts in good faith, and (2) has reasonable, articulable grounds to believe that the suspect is the intended arrestee." *Id.* at 379. "Should doubt as to the correct identity of the subject of [the] warrant arise, the arresting officer obviously should make immediate reasonable efforts to confirm or deny the applicability of the warrant to the detained individual," the Court of Appeals continued, and if "the officer reasonably and in good faith believes that the suspect is the one against whom the warrant is outstanding, a protective frisk pursuant to the arrest of that person is not in contravention of the Fourth Amendment" and any "evidence seized incident to the arrest [is] properly [] admitted into evidence." *Id.* The language in *Sanders* upon which Plaintiff relies plainly does not apply to the tort of false imprisonment.

Finally, Plaintiff argues that "the Metropolitan Police Department had extensive information establishing that Plaintiff Vasquez was not the person wanted in the warrant." Pl.'s

Opp'n at 3–5.  He points to *United States v. Valez*, 796 F.2d 24, 28 (2d Cir. 1986), in support of the proposition that, under the collective knowledge doctrine, "a failure of law enforcement officers to communicate exonerating information *can* render an arrest unreasonable, depending on the circumstances."  *Id.*  But *Valez* does not help Plaintiff.  Like *Sanders*, *Valez* is a criminal case assessing the reasonableness of an arrest under the Fourth Amendment.  It is not a false imprisonment case.  It does not hold that exonerating information not known to an officer, but known by others, can be imputed to the officer to trigger a duty to release.

The duty-to-release inquiry is intensely subjective.  It provides that an officer who is otherwise privileged to detain a person based on an arrest warrant loses that privilege only if he "undoubtedly" learns that the person described in the warrant is not the person in custody.  Based on the evidence presented, and viewing that evidence in the light most favorable to Plaintiff, no reasonable jury could have concluded that Officer Rollins "undoubtedly" knew Plaintiff was not the Jose T. Vasquez wanted by Will County, so as to trigger a duty to release.  Accordingly, the District's motion for judgment as a matter of law is granted.

## V.     MOTION FOR REMITTITUR

In the alternative, the court would grant the District's motion for remittitur.  Remittitur is appropriate "when (1) the verdict is beyond all reason, so as to shock the conscience, or (2) the verdict is so inordinately large as to obviously exceed the maximum limit of a reasonable range within which the jury may properly operate."  *Peyton v. DiMario*, 287 F.3d 1121, 1126 (D.C. Cir. 2002).  "[J]ury verdicts must strike a balance between ensuring that important personal rights are not lightly disregarded, and avoiding extravagant awards that bear little or no relation to the actual injury involved."  *Phillips v. District of Columbia*, 458 A.2d 722, 726 (D.C. 1983).  In the D.C. Circuit, remittitur is permitted "only if the reduction 'permit[s] recovery of the highest

amount the jury tolerably could have awarded.'" *Langevine*, 106 F.3d at 1024 (quoting *Carter*, 795 F.2d at 135 n.13). "In attempting to strike such a balance in false arrest cases, the length of confinement is an appropriate factor for the jury to consider." *Phillips*, 458 A.2d at 726.

      In this case, the court instructed the jury regarding damages as follows:

> The District of Columbia is liable to pay damages only for the harm that its conduct caused Mr. Vasquez on March 3 and 4, 2017, and the ensuing days. . . . You may not award Mr. Vasquez any damages from any harm that arose prior to the handling of his case by the MPD Fugitive Unit. . . . You shall not award any damages to Mr. Vasquez for [any] prior arrests and/or detentions and you may not award any damages to Mr. Vasquez for any permanent or long-term harm caused by those prior events. However, you may consider how his prior arrest and detention in 2016 by MPD affected Mr. Vasquez on March 3 and 4, 2017.

Jury Instructions at 10–11. The jury awarded Plaintiff $100,000 in damages.

      The District argues that the award was excessive because the jury was prohibited from "award[ing] damages to Plaintiff for any period of incarceration that occurred before Officer Rollins began processing Plaintiff's fugitive from justice charge on March 4, 2017." Def.'s Mot. at 42.[7] "Even offering Plaintiff a generous inference that the duty to release him was triggered when Officer Rollins ran the NCIC search [and saw the mismatched Social Security numbers] at 11:40 a.m. . . . Plaintiff can only establish with any certainty that he was in custody for roughly *three* additional hours when Officer Rollins presented the complaint to the prosecutor." *Id.* at 43. An award of $100,000 for three (or at most four) hours of incarceration, in the District's view, "breaks down to an astonishing award of over $33,000 [or $25,000] for *each hour*" of unlawful detention. *Id.*

---

[7] The court did not permit the jury to award damages for any injury prior to the MPD Fugitive Unit's involvement in the case, because there was no evidentiary basis on which to find that MPD had a duty to release Plaintiff until his case landed in the hands of the MPD Fugitive Unit. Jury Instructions at 11.

Plaintiff responds that his "situation is unique, and not at all analogous to other false imprisonment cases." Pl.'s Opp'n at 17.  Plaintiff's prior arrests and detentions, coupled with the fact that he was accused of "lying" and called "a murderer" by MPD officers when he presented exonerating evidence, "added a particularly frightening Kafkaesque element to his detention." *Id.* Plaintiff further contends that the District mischaracterizes the record.  In Plaintiff's view, the unlawful detention clock started at 10:00 a.m. when Officer Rollins received the lock-up list and ran until "sometime in the late afternoon" when Plaintiff had his court appearance. *Id.*  Plaintiff notes that the jury was permitted to consider damages in the subsequent days because, as the court itself had suggested during trial, Plaintiff's "damages didn't simply vanish the moment he was released from [MPD] custody—they would have continued for some time thereafter." *Id.*[8]  *See, e.g., Williams v. Lucy Webb Hayes Nat. Training Sch. for Deaconesses & Missionaries*, 924 A.2d 1000, 1003 (D.C. 2007) (holding that the testimony of a plaintiff who had not designated an expert could support damages for "pain and suffering that she experienced over a period of hours, not longer").

Based on the trial record, the court finds that the earliest Officer Rollins could have been made aware of the Social Security number mismatch, and thus the earliest the duty to release could have been triggered, would have been when he ran the NCIC Report at 11:40 a.m. on March 4. *See* NCIC Rep. at 2.  Viewing the evidence in the light most favorable to Plaintiff, assuming that Plaintiff was released at the latest at 5:00 p.m. on March 4, he was unlawfully detained for, at most, approximately five hours.  The jury was permitted to award damages for the harm caused in "the ensuing days" and to "consider how his prior arrest and detention in 2016 by MPD affected

---

[8] Plaintiff was not permitted to recover damages for any claimed long-term injury because he did not offer expert testimony to support the element of causation.

Mr. Vasquez." Jury Instructions at 11.  Thus, the jury was only permitted to award damages for the up-to-five hours of unlawful detention and the ensuring three to four days.

The D.C. Circuit has noted that, "[b]ecause of the unique circumstances of each case as well as the adjustments which would necessarily have to be made for inflation, it is awkward to discuss the size of an award through comparison with past decisions." *Peyton*, 287 F.3d at 1127 (quoting *Mariner v. Marsden*, 610 P.2d 6, 16 (Wyo. 1980)).  "[A]lthough the Court is cognizant of the limitations of case comparisons, it does not equate the D.C. Circuit's caution in this area with a prohibition." *Jean-Baptiste*, 931 F. Supp. 2d at 14.  The court "will consider, at least in part, similar cases to determine the appropriate award for damages." *Id.*

The court has considered the following cases identified by the District in determining what damages award is appropriate in the this case: *Pitt v. District of Columbia*, 404 F. Supp. 2d 351, 356 (D.D.C. 2005), *aff'd in part, rev'd in part and remanded on other grounds*, 491 F.3d 494 (D.C. Cir. 2007) (awarding $100,000 for 10 days of unlawful detention); *Wright v. United States*, No. 95-cv-0274 (LFO), 1997 WL 335790, at *2 (D.D.C. June 4, 1997) (awarding $1,000 for an unlawful overnight detention); *Koroma v. United States*, 628 F. Supp. 949, 951, 953 (D.D.C. 1986) (awarding $1,500 for unlawful overnight detention).  *Wright* and *Korama* offer a particularly helpful guide, as each involved limited periods of wrongful detention.  In addition, District of Columbia courts have awarded less than $2,000 per day in cases involving wrongful convictions and decades-long sentences.  *See Tribble v. District of Columbia*, No. 2013-ca-003237-B, 2016 WL 927078, at *25 (D.C. Super. Feb. 26, 2016) (awarding $13,234,527 for 25 years of wrongful incarceration, approximately $1,450 per day); *Odom v. District of Columbia*, No. 2013-ca-3239, 2015 WL 13754573, at *5 (D.C. Super. July 22, 2015) (awarding $9,654,500 for approximately 22 years of wrongful incarceration, approximately $1,200 per day).  Although the per-day

compensatory amount in those cases is naturally lower because of the length of incarceration, the pain and suffering experienced by those plaintiffs cannot be compared to what Plaintiff experienced during a limited period of unjustified detention.  Notably, Plaintiff did not identify any comparable case to support the jury's award.  *See* Pl.'s Opp'n at 16–18.

Taking into account the length of unlawful confinement in the instant case (at most five-hours); additional emotional injury incurred in the ensuing four days; inflation; and Plaintiff's particular vulnerability due to his past wrongful arrests, the court finds that $6,000 is "the highest amount the jury tolerably could have awarded." *Carter*, 795 F.2d at 135 n. 13.  The court reaches that amount by an award of $2,000 for the unlawful five-hour detention and $1,000 in damages for each of the next four days.  Because "reduction of a compensatory damage award may not be made without offering plaintiff the option of a new trial," Plaintiff has the option of rejecting the reduced award in favor of a new trial, if the factual sufficiency of the jury's verdict were to be sustained on appeal.  *Jean-Baptiste*, 931 F. Supp. 2d at 12; *see Carter*, 795 F.2d at 135 ("[T]he appropriate procedure [for remittitur] is to pose to plaintiffs the choice between consent to the reduction and a new trial.").

## VI.    CONCLUSION

For the stated reasons, Defendant's Motion for Judgment as a Matter of Law, ECF No. 126, is granted.  Alternatively, the court would grant Defendant's Motion for Remittitur and reduce the damages award to $6,000.  In light of the court's rulings, it does not reach the District's arguments for a new trial.  A final, appealable order accompanies this Memorandum Opinion.

Dated:  March 29, 2023

Amit P. Mehta
United States District Judge